Coos,
No. 4871.

PEERLESS INSURANCE COMPANY *v.* JAY J. GOULD & *a.*

Argued October 4, 1960.
Decided December 27, 1960.

*Wiggin, Nourie, Sundeen, Nassikas & Pingree* (*Mr. Nourie* orally), for the plaintiff.

*Goodnow, Arwe & Ayer* (*Mr. Goodnow* orally), for the defendants Gould and Ledger.

*J. L. Blais* for the defendant Wheeler, *George H. Keough* for the defendants Gallant, and *Bergeron & Hanson* for the defendants Morin, furnished no briefs.

DUNCAN, J. The findings of the Trial Court establish that at all material times the defendant Gould was engaged in several distinct enterprises. He operated Gould's Sales & Service which consisted of a service station and repair shop, also used as a sales agency for used cars. In connection with this business he held a dealer's license from the State of New Hampshire and was issued three sets of dealer's registration plates. He was also engaged in a junk business in the course of which he bought damaged automobiles, using parts taken from them in the repair and service business, and selling what remained as scrap. He owned and conducted two farms which adjoined the service station. He owned and operated two tractors and three trailers with which he transported paper under contract with the Groveton Paper Company. He likewise owned and operated two Ford trucks which were used in highway maintenance work for the State. These vehicles were registered in his name individually. Finally, he was engaged in lumbering operations in the course of which he had a reported income of approximately $24,000 for 1956 and 1957, and in 1957 had trucked a thousand cords of pulp wood to the Brown Company in Berlin, a distance of twenty-six miles. Approximately six hundred cords were transported for him by independent truckers. Between April 1, 1957, when the truck involved in the accident was registered for commercial use in Gould's name individually, and December 30, 1957, when the accident occurred, some three hundred six cords of pulp wood were transported to Berlin by means of the truck which was involved in the accident.

This truck was a 1951 10-wheel Chevrolet which Gould purchased in November 1956, intending to resell it, according to the findings. After purchase, a body was installed on the truck and when

negotiation with two prospective purchasers failed, it was kept in the used car lot and used occasionally to haul disabled vehicles to the lot and to haul away junk or rubbish.

In April 1957 following warning by the State Police that the truck should have commercial registration if used on the public highways, Gould registered it in his own name at a cost of $180. Thereafter it was used "a few times" to haul tires, used vehicles, and junk and on two occasions to carry a load of hay from the meadow to the barn. Between April 1 and December 30, 1957 it was used a total of forty-two days to haul pulp wood to Berlin. Eighteen of these days fell after September 25, when the policy took effect.

The Court found that "at the time of the accident the truck was not 'used principally in the . . . operations'" referred to by the policy. In response to plaintiff's requests for findings the Court found "from April 1, 1957 to the time of the accident, December 30, 1957, the . . . truck was principally used in an enterprise not connected with or incidental to Gould's Sales & Service which was a used car operation." In accordance with the defendants' requests, the Court also found that the truck was "held for sale at all times during the period and kept on the used car lot when not being put to some actual operating use" and that "the ownership, maintenance and retention of the accident truck for sale [from April 1 to December 30, 1957] and the transportation of tires, motor vehicles and junk remnants with the same . . . were uses in connection with the specified policy business operations." The policy is to be construed in the light of these and other findings to which reference will be made.

It has been pointed out that a garage liability policy furnishes more types of coverage than most liability forms. "[It] is one of the most complex, and perhaps least understood, liability forms in use today. Its complexity is largely attributable to the breadth of coverage, that is, it embraces a multiplicity of hazards which otherwise are written under separate policies." *Morrison* v. *Anchor Casualty Co.,* 53 Wash. 2d 707, 708-9.

The policy involved in this case was no exception. It insured (1) against the hazards of ownership, maintenance or use of the premises as a sales agency, repair shop and service station and (2) "all operations necessary or incidental thereto," which appears to include product liability. 2 Richards on Insurance (5th *ed.*) *s.* 296. See *Welborn* v. *Ill. Nat. Cas. Co.,* 347 Ill. App. 65. It insured

(3) against damages arising out of "the ownership, maintenance or use of any automobile in connection with the above defined operations." It further insured (4) against damages arising out of "occasional use for other business purposes" of any automobile owned by the insured "and used principally in the above defined operations." Other coverages afforded are not material here.

While the third coverage described above is broad in scope it does not apply in this case even though the truck was maintained and upon occasion used "in connection with" the insured operations, because the damages caused by the accident in question did not "arise out of" ownership, maintenance or use in connection with the insured business or any operation necessary or incidental thereto. *Spiegel* v. *Felton* (Supr. Ct.) 134 N. Y. S. 2d 242. See also, *Olson* v. *Standard Acc. Ins. Co.*, 211 F. 2d 661 (8th Cir. 1954). Hence if coverage is afforded by the policy it must be by virtue of the provisions numbered (4) above.

The findings of the Trial Court, which were warranted by the evidence, preclude coverage under these provisions of the policy, since it was found that the truck from the time of its registration to the date of the accident was "used principally" in an enterprise *not* connected with or incidental to Gould's Sales & Service, and that at the time of the accident it was *not* "used principally" in the operations described by the policy.

The defendant Gould asserts that these findngs are unwarranted because, as the Court also found, during the period of two hundred seventy-four days from April 1 to December 30, the truck was used to haul pulp for only forty-two days, and during the period of ninety-six days while the policy was in effect before the accident, the truck was so used for only eighteen days; and for the remainder of the time it was "used" as a part of the insured's used car stock in trade, by being parked on the used car lot. Hence it is argued, that as a matter of law "principal use" was in connection with the "described operations," and the use to haul pulp was by comparison merely an "occasional use for other business purposes" within the meaning of the policy.

We are unable to accept this contention. It is settled law in this jurisdiction that the interpretation of a policy of insurance is controlled by what the language used would mean to a reasonable man in the position of the policy holder. *Merchants &c. Cas. Co.* v. *Capobianco*, 100 N. H. 223; *Eastern Transp. Co.* v. *Liberty Mut. Cas. Co.*, 101 N. H. 407, 410. From the provision that "use for

other business purposes" would be insured provided the vehicle had been "used principally in the above defined operations," the ordinary policy holder would reasonably understand that what was meant by "use" in both instances was "use" as a vehicle. Certainly use of the vehicle as stock in trade for some "other business" would not reasonably be thought intended as an insured "use." Similarly "principal use" in the "defined operations" would not be taken to mean use as merchandise on display for sale, while standing idle, and "unused" as a vehicle.

It seems plain that the provision in question was designed to furnish automobile liability coverage of the more usual type in addition to the special garage features of the policy. This is indicated in part by the further coverage, not here involved, of "any automobile owned . . . for the use of . . . a partner . . . an executive officer . . . or a member of the household of any such person." See *Hartford Acc. & Ind. Co.* v. *Casualty Underwriters*, 130 F. Supp. 56 (D. C. Minn. 1955). Hazards which might arise out of use of the truck as merchandise on the lot would be covered by other provisions of the policy, in particular those relating to damages arising out of "ownership, maintenance or use of any automobile *in connection with* the above defined operations," which we have designated (3) above. (Emphasis supplied). See *Kenner* v. *Century Indemnity Co.*, 320 Mass. 6.

The coverage afforded by clause (4), which depends for its application primarily upon the "use" made of the vehicle, must be interpreted to relate to "use" of the automobile in the ordinary sense, as a vehicle, rather than as merchandise on display, as the insured would have us hold. See *Littlefield* v. *Insurance Co.*, 86 N. H. 87. We conclude that the policy, apart from the New Hampshire motor vehicle endorsement, affords no coverage.

As was pointed out in *American Cas. Co.* v. *Senecal*, 100 N. H. 261, 264, it is a characteristic of the garage liability policy that under it an automobile may "be insured for a time, and uninsured for a time, depending upon the use to which it [is] put." In order to establish coverage under a garage liability policy the vehicle must be capable of being identified as one intended to be insured by the policy. *Id.*, 265. In practice, it appears, no vehicle is customarily described by make, model, or number in a policy of this type. For identification of an insured vehicle, reliance must be placed wholly upon a showing that the particular vehicle comes within the policy description of the vehicles insured.

It is plain upon the findings that the truck in question was at times insured under the plaintiff's policy prior to the accident. Thus the Trial Court found that use of the truck "to carry parts and accessories from places of purchase to the garage . . . and . . . to carry or tow used vehicles from places of purchase to the same localities; and . . . to transport . . . remnants or junk, so-called, accumulated in the conduct of said business operations" were uses in connection with the operation of the used car business, so that the truck was then "covered by this policy and was an insured use within the meaning and provisions of the same." As previously noted, the Court also found that the "ownership, maintenance and retention of the accident truck for sale" was "in connection with the specified policy business operations."

Thus the truck was capable of being identified as a vehicle which was insured at times under the policy provision which we have referred to as (3) above. Hazards arising out of "retention of the accident truck for sale" upon the insured premises would also have been insured against, under clause (3) or preceding clauses.

The plaintiff argues that the truck was at no time an insured vehicle under the policy because it was conclusively shown to have been "withdrawn from the operation of the business before the risk under the policy attached," that is before September 25, 1957; and because "there is no clear evidence . . . that it was ever used, even incidentally, in the used car operation" after that date.

The plaintiff's request for a finding that the truck was "used for a separate and distinct enterprise" after April 1, 1957 was granted by the Trial Court with the qualification that it was also kept on the used car lot. The Court did find that "at some time after April 1, 1957, the truck was more useful to Gould as a pulp truck and was so identified in his mind, than it was as a vehicle associated with his used car business for resale." The finding that it was used after April 1, 1957 "a few times to haul tires, wrecked and used motor vehicles and junk remnants," did not establish that these uses occurred while the policy was in effect, and the time of these uses does not clearly appear from the evidence.

However, had accidental injury to a prospective customer engaged in inspection of the truck resulted from the insured's negligence while the truck was being maintained on the used car lot and was not in operation, there would have been little room to question coverage under the first three clauses of the "definition of hazards."

The findings that the truck was "kept on the used car lot when

not being put to some actual operating use," and that its retention for sale at all times was "in connection with the specified policy business operations" were clearly warranted by the record. Hence sustainable findings which establish that there was coverage of the truck during the effective term of the policy become decisive of the question of its identification as an insured vehicle at some time during the term. It follows under the Financial Responsibility Act which was made a part of the policy by the endorsement that the condition contained in clause (4) of the definition of hazards, requiring that a vehicle owned by the insured must have been "used principally in the above-defined operations" in order to be covered for "occasional use for other business purposes," cannot "operate to defeat or avoid the policy so as to bar recovery" for the accident in question. RSA 268:16 III. Upon the occurrence of the accident the plaintiff's liability became absolute, under the statute. *American Cas. Co.* v. *Senecal, supra,* 265-266.

The plaintiff is required by the statutory motor vehicle liability policy endorsement to defend the pending actions and to satisfy any resulting judgments against the insured, within statutory limits. The numerous exceptions taken by the plaintiff and the defendant insured to findings made by the Court and to rulings upon their requests for findings are overruled.

*Remanded.*

All concurred.