Hillsborough-southern judicial district
No. 97-882

BETH CECERE

v.

AETNA INSURANCE COMPANY

January 16, 2001

*Hall, Hess, Kenison, Stewart, Murphy & Brown, P.A.*, of Manchester (*Francis G. Murphy, Jr.* on the brief and orally), for the plaintiff.

*Ouellette, Hallisey, Dibble & Tanguay, P.A.*, of Dover (*Stephen J. Dibble* on the brief and orally), for the defendant.

BRODERICK, J. The defendant, Aetna Insurance Company, appeals an order of the Superior Court (*Dalianis*, J.) voiding the underinsured motorist (UM) limits in its garage liability policy and compelling arbitration. We reverse.

The plaintiff, Beth Cecere, was injured in an accident on October 5, 1992, while driving an automobile owned by H.J. Nassar Motor Company (Nassar) of Lawrence, Massachusetts. Her husband, Lou Cecere, was employed by Nassar, a Massachusetts corporation engaged in the business of selling and servicing new and used automobiles. At the time of the accident, the plaintiff and her husband lived in Derry.

The automobile used by the plaintiff was a demonstration model registered to Nassar in Massachusetts, and bore dealer license plates from that State. As part of Nassar's stock in trade, it could

have been sold by Nassar at any time. In accordance with his employment agreement with Nassar, Mr. Cecere was permitted to use the vehicle only in connection with his job and for limited personal purposes. In fact, he used the vehicle to commute to work and kept the automobile at his home in Derry each night. Several other Nassar employees who lived in New Hampshire were also permitted to use company-owned automobiles for travel to and from work.

At the time of the accident, the automobile was insured under a "Massachusetts Motor Vehicle Policy, Garage Liability" policy issued to Nassar by the defendant. The policy provided liability coverage in the amount of $1 million and underinsured motorist coverage in the amount of $100,000 for each injured occupant, to a maximum of $300,000 per accident. Before the accident, the defendant or its agent knew that Mr. Cecere kept the car at his home in Derry each night.

On October 5, 1992, the plaintiff was using the automobile in New Hampshire to perform a personal errand when she was hit by a driver who carried liability coverage in the amount of $100,000. She sued the operator and recovered the policy limit. Because the liability limit of the tortfeasor was identical to the UM limit provided under the Nassar policy, the defendant denied the plaintiff UM benefits.

In May 1995, the plaintiff filed an action to compel arbitration, claiming that RSA 264:15, I (1993) voided the UM limit in Nassar's policy and increased it to the policy's liability limit of $1,000,000. Following a hearing, the superior court ordered arbitration. It ruled that the parties had not expressly chosen Massachusetts law to govern their contract, and that under a common law choice-of-law analysis, New Hampshire law controlled because the insured motor vehicle was garaged here. See Green Mt. Ins. Co. v. George, 138 N.H. 10, 13, 634 A.2d 1011, 1013 (1993). It also ruled that RSA 264:15, I, voided the UM liability limit in Nassar's policy because the statute applies to insurance policies on motor vehicles principally garaged in New Hampshire.

On appeal, the defendant argues that the parties elected to be governed by Massachusetts law, as evidenced by numerous references to Massachusetts law in the policy. Alternatively, the defendant contends that a choice-of-law analysis favors Massachusetts law because the principal location of the insured risk is Massachusetts. Finally, it argues that even if New Hampshire law controls the policy, RSA 264:15, I, does not void its UM provision because that statute applies only to insurance policies issued under the provi-

sions of New Hampshire's insurance regulatory scheme, RSA 264:14 (1993).

We first examine whether the insurance policy is expressly governed by Massachusetts law. *See Mathena v. Granite State Ins. Co.*, 129 N.H. 249, 251, 525 A.2d 284, 285 (1987). It is well established that

> in the absence of an express choice of law validly made by the parties, the contract is to be governed, both as to validity and performance, by the law of the state with which the contract has its most significant relationship . . . . The principal location of the insured risk is the contact that is given the greatest weight in determining the state whose local law is to govern . . . the rights created thereby.

*Id.* (quotations omitted). "Particularly in the context of insurance contracts, we have found that the State which is the principal location of the insured risk bears the most significant relationship to the contract, in the absence of an express choice of law by the parties." *Glowski v. Allstate Ins. Co.*, 134 N.H. 196, 198, 589 A.2d 593, 595 (1991) (quotation omitted). This rule articulates "the fundamental contract policy of giving effect to the intention of the parties and their reasonably justified expectations," *Consolidated Mut. Cas. Co. v. Radio Foods Co.*, 108 N.H. 494, 496-97, 240 A.2d 47, 49 (1968) (quotation omitted), and promotes predictability of results, which is of foremost concern in contracts cases, *see Glowski*, 134 N.H. at 198, 589 A.2d at 595.

In this case, the policy makes multiple references to Massachusetts law. For example, the policy states that the defendant "will pay on behalf of the insured, in accordance with the 'Massachusetts Compulsory Automobile Liability Security Act,' Chapter 346 of the Acts of 1925 of the Commonwealth of Massachusetts and all Acts amendatory thereof or supplementary thereto . . . ." It does not, however, *expressly* select Massachusetts law to govern its terms. *See Consolidated*, 108 N.H. at 496, 240 A.2d at 48-49. The law which governs the policy, therefore, is determined by application of the choice-of-law doctrine. *See Glowski*, 134 N.H. at 198, 589 A.2d at 595. Nassar's insurance policy is a garage policy, which is "designed primarily to afford protection against liability which might arise out of the operation of a . . . garage, including risks from the operation of automobiles in the course of the business . . . ." *Allstate Insurance Co. v. Roberts*, 109 N.H. 108, 111, 244 A.2d 199, 202 (1968) (quotation omitted).

[A] garage liability policy furnishes more types of coverage than most liability forms. It is one of the most complex, and perhaps least understood, liability forms in use today. Its complexity is largely attributable to the breadth of coverage, that is, it embraces a multiplicity of hazards which otherwise are written under separate policies.

*Peerless Ins. Co. v. Gould*, 103 N.H. 134, 137, 166 A.2d 462, 464 (1960) (quotation and brackets omitted). Accordingly, the entire garage operation, including a subset of risks from automobile operation, must be examined when considering the principal location of the insured risk.

In this case, the principal location of the insured risk is Massachusetts. The Nassar dealership, the site of the vast majority of automobiles insured under its policy, conducted operations only in that State. Moreover, its insurance policy is designed to insure bodily injury or property damage resulting from activities located primarily upon the garage site. The policy defines "motor vehicle hazard" as:

(a) The ownership, maintenance or use of any motor vehicle for the purpose of garage operations, (b) the occasional use for other business purposes and the use for non-business purposes of any motor vehicle owned by or in charge of the Named Insured and used principally in garage operations, and (c) the ownership, maintenance or use of any motor vehicle owned by the Named Insured while furnished for the use of any person.

The principal location of the insured risk for provisions (a) and (b) is Massachusetts, as they insure risks that are exclusively or primarily associated with the conduct of garage operations. "Garage operations" is defined in the policy as all operations necessary or incidental to "[t]he *ownership, maintenance or use of the premises* for the purposes of a garage." (Emphasis added.)

Admittedly, provision (c) does not similarly fix the principal location of the insured risk because it insures any vehicle that Nassar provides for the use of its employees, who commute to work from their New Hampshire homes. Nassar employees' use of company cars, however, is limited by agreement to use in connection with their duties as salespeople and limited use for personal purposes, thus limiting the out-of-state use of vehicles insured under Nassar's policy. Moreover, in the context of the totality of all risk insured by Nassar's policy, the dominant risk is in Massachu-

setts. *See McClaney v. Utility Equipment Leasing Corp.*, 560 F. Supp. 1265, 1268 (N.D.N.Y. 1983) (principal location of risk insured by garage policy is State of insured's principal business location and domicile).

The plaintiff cites several of our past decisions in support of her argument that the principal location of the insured risk, in the context of an automobile liability policy, is where the motor vehicle is garaged. *See Green Mt.*, 138 N.H. at 10, 634 A.2d at 1013-14; *Ellis v. Royal Ins. Co.*, 129 N.H. 326, 330, 530 A.2d 303, 306 (1987). These cases are distinguishable, however, because the insurance policies at issue were not *garage policies*, and accordingly the analysis for identifying the principal location of the insured risk was different than in this case. In *Green Mountain*, the defendant and her husband were insured by an individual motor vehicle liability policy. *Green Mt.*, 138 N.H. at 12, 634 A.2d at 1013. Where only one car is insured under a liability policy, the State with the most significant relationship to the contract is likely to be the State where the single insured car is garaged. *See Green Mt.*, 138 N.H. at 13, 634 A.2d at 1013-14.

In *Ellis*, an employee who worked at a New Hampshire location of the insured company, Purolator, was injured in an automobile accident within the scope of her employment in New Hampshire. *Ellis*, 129 N.H. at 327, 530 A.2d at 304. Purolator was a New Jersey corporation with business operations and a "multiple risk" insurance policy extending to several States, including New Hampshire. *See Ellis*, 129 N.H. at 332, 530 A.2d at 307. We found that the law of New Hampshire controlled because where a policy covers risks in multiple States, the risk of each individual State is "to be treated as though it were insured by a separate policy and the validity of and rights under the multiple risk policy as to this risk are to be governed by the laws of [that] state." *Id.* at 331, 530 A.2d at 306 (quotation omitted). We relied on the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, which provides an example of a "multiple risk" policy:

> A single policy may . . . insure dwelling houses located in states X, Y and Z. These states may require that any fire insurance policy on buildings situated within their territory shall be in a special statutory form. If so, the single policy will usually incorporate the special statutory forms of the several states involved. Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an

individual risk. So, if the house located in state X were damaged by fire . . . the court would determine the rights and obligations of the parties under the policy . . . in accordance with the local law of X.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 193, comment *f* at 613-14 (1971). The garage policy in this case neither insures property that is permanently located in different States, nor incorporates the special statutory forms of more than one State. Accordingly, the choice-of-law analysis of a multiple risk insurance liability policy articulated in *Ellis* is inapplicable to this case.

We emphasize that our conclusion in this case rests substantially, if not entirely, on the unique nature of garage insurance policies. Were the policy at issue a "multiple risk" policy or an individual automobile policy rather than a garage policy, we might be less inclined to conclude that the "principal location of the insured risk" is in Massachusetts.

The dissent contends that regardless of whether the policy is governed by Massachusetts law, the New Hampshire uninsured motorist statute, RSA 264:15, I, controls because it affords New Hampshire residents a statutory right to certain underinsured motorist coverage. *See* RSA 264:15, I; RSA 259:117 (1993) (explaining that the phrase "uninsured" includes underinsured). The defendant asserts that RSA 264:15, I, cannot control the policy at issue here because it was not issued pursuant to New Hampshire regulations. We need not resolve this issue because we hold that Massachusetts law controls, even if RSA 264:15, I, applies.

Arguably, the uninsured motorist statutes of both New Hampshire and Massachusetts apply to the policy. RSA 264:15, I, may apply because the policy pertains to a vehicle that is principally garaged in New Hampshire. *See* RSA 264:15, I. Massachusetts's uninsured motorist statute may apply because the policy was issued or delivered in Massachusetts with respect to a vehicle registered in Massachusetts. *See* Mass. Gen. Laws Ann. ch. 175, § 113L(1) (West 1998).

Although both statutes may apply, they conflict. The policy limits here violate New Hampshire law and comply with Massachusetts law. *See* RSA 264:15, I; Mass. Gen. Laws Ann. ch. 175, § 113L(2) (West 1998). Moreover, the two statutes serve different public policies. The purpose of the New Hampshire statute is to protect the insured. *See Wyatt v. Maryland Cas. Co.*, 144 N.H. 234, 239, 738 A.2d 949, 953 (1999). By contrast, Massachusetts made uninsured motorist coverage optional to "lower the cost of automobile insur-

ance premiums." *Murphy v. Safety Ins. Co.*, 709 N.E.2d 410, 413 n.7 (Mass. 1999).

■ Massachusetts is the principal location of the risk, however, and its uninsured motorist statute controls. The policy's underinsured motorist liability limits are thus valid and enforceable.

In light of our holding, we need not reach the defendant's remaining arguments.

*Reversed.*

JOHNSON, J., sat for oral argument but retired prior to the final vote; THAYER, J., sat for oral argument but resigned prior to the final vote; BROCK, C.J., and NADEAU, J., concurred; HORTON, J., retired, specially assigned under RSA 490:3, dissented; NADEAU, J., took part in the final vote by consent of the parties.

HORTON, J., dissenting: The majority negates the effect of RSA 264:15, I, on coverage of an automobile principally garaged in this State by invoking conflict of laws rules to import the Massachusetts law regulating coverage for the risk. The majority finds an implicit choice of law in the policy and finds that, by the nature of the garage policy coverage, all covered risks, or at least in totality the dominant risk, is a Massachusetts risk. From this analysis, the majority insulates the coverage afforded from New Hampshire regulation of a uniquely New Hampshire piece of that risk. I disagree with both the principle of, and the analysis supporting, the majority position, and respectfully dissent, voting to affirm the trial court.

The policy of insurance at issue is a garage liability policy. Such a policy "embraces a multiplicity of hazards," *Peerless Ins. Co. v. Gould*, 103 N.H. 134, 137, 166 A.2d 462, 464 (1960) (quotation omitted), many of which must be anticipated to be extraterritorial as well as territorial (*e.g.*, demonstrator vehicles, loaners, transport). The policy at issue does not contain an express choice of law provision, nor does it contain the broad extraterritorial coverage language common to many policies. As the majority notes, it makes frequent reference to Massachusetts law and was clearly written for a Massachusetts corporation as the primary insured. This does not trigger an implied choice of law, or insulation from extraterritorial regulation for all purposes. The policy adverts to its extraterritorial reach and attempts to structure coverage liability, acknowledging the propriety and effect of foreign regulation — as to Coverages B (bodily injury liability) and C (property damage liability) at page 11 (Condition II-8), and as to Part V (uninsured motorist) in the Uninsured Motorists Coverage endorsement, page 1. Reading the

policy as a whole, I would find no implied choice of law, nor would I find any contractual territorial insulation.

Nor would I adopt a theory of dominant risk. The policy at issue affords coverage to a bundle of risks. It is probable that most of the risks in the bundle are uniquely Massachusetts risks, but it is apparent that some of the risks are extraterritorial, and some are uniquely foreign. Where the insured risk is a demonstrator vehicle assigned to a salesman who is resident in a foreign jurisdiction and garages the vehicle in that jurisdiction, the risk is uniquely foreign. The risk is governed by the vehicle, *Turner v. St. Paul Prop. & Liab. Ins. Co.*, 141 N.H. 27, 29, 676 A.2d 109, 111 (1996), and, although the bulk of the risks reside in Massachusetts, we look to the New Hampshire risk separately. *Consolidated Mut. Cas. Co. v. Radio Foods Co.*, 108 N.H. 494, 497, 240 A.2d 47, 49 (1968). I find nothing in the policy, or in the structure or nature of coverage, that would justify straying from these rules and deciding all coverage issues in the bundle based on some principle of totality.

As to this New Hampshire risk, and where we have New Hampshire residents rightfully in possession of the insured vehicle, principally garaging the vehicle in New Hampshire, and suffering uninsured damage from a New Hampshire accident with the insured vehicle, I would hold that RSA 264:15, I, controls and the policy must provide the minimum uninsured motorist coverage mandated by the statute.